IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CHRISTOPHER HICKS,          )
                            )
            Plaintiff,      )
                            )
     v.                     )       1:20CV366
                            )
KILOLO KIJAKAZI,            )
Acting Commissioner of Social Security, )
                            )
            Defendant.      )

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Christopher Hicks ("Plaintiff") brought this action pursuant to Section 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for Supplemental Security Income ("SSI") under Title XVI of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.   PROCEDURAL HISTORY

Plaintiff received Child Supplemental Security Income from June 14, 2007 until February 12, 2016, at which point the Social Security Administration ("SSA") redetermined his disability status as an adult and terminated his benefits. (Tr. at 70, 82, 85-87.)[1] Following an unsuccessful reconsideration hearing before a State agency Disability Hearing Officer (Tr.

---

[1] Transcript citations refer to the Sealed Administrative Record [Doc. #12].

at 13, 98-112), Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ") (Tr. at 13, 113). On September 10, 2018, Plaintiff, along with his attorney, attended the subsequent hearing, during which an impartial vocational expert testified. (Tr. at 13.) The ALJ ultimately concluded that Plaintiff was no longer disabled within the meaning of the Act (Tr. at 25), and, on February 24, 2020, the Appeals Council denied Plaintiff's request for review of the decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-6).

II. LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the] review of [such an administrative] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal brackets omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is

evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that in administrative proceedings, "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2]

---

[2] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first two steps, and establishes at step three that the impairment "equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations," then "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual function[al] capacity ('RFC')." Id. at 179.[3] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can

---

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that pursuant to the administrative regulations, the "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be

4

"perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the Commissioner to prove that a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the first step regarding "substantial gainful activity" is modified for redetermination cases, and the ALJ found that Plaintiff satisfied the first step of the sequential evaluation process because Plaintiff had received supplemental security income benefits as a child in the month prior to turning 18 and was notified of his redetermination under the rules for adults as of February 12, 2016. (Tr. at 14-15.) See 20 C.F.R. 416.987(b). At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> obesity, back arthralgias, borderline intellectual functioning (hereafter BIF), depression, and attention deficit hyperactivity disorder (hereafter ADHD)[.]

---

determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

(Tr. at 15.) The ALJ found at step three that none of these impairments, individually or in combination, met or equaled a disability listing. (Tr. at 15-17.) Therefore, the ALJ assessed Plaintiff's RFC and determined that, as of his redetermination date, Plaintiff was able to perform medium work with the following, additional limitations:

> [Plaintiff] can perform simple, routine and repetitive tasks. [He] can have occasional contact with coworkers and supervisors, but no contact with the public. [Plaintiff] can perform work that involves routine changes, but is not production oriented. [He] must learn work by demonstration. [Plaintiff] cannot perform work where driving an automobile is required for the completion of job tasks.

(Tr. at 17.) At step four of the sequential analysis, the ALJ found that Plaintiff had no past relevant work. (Tr. at 23.) However, the ALJ found at step five that, given Plaintiff's age, education, work experience, RFC, and the testimony of the vocational expert as to these factors, he could perform other jobs available in significant numbers in the national economy. (Tr. at 24-25.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 25.)

Plaintiff now raises two challenges to the ALJ's decision. Specifically, Plaintiff contends that the ALJ (1) failed to resolve an apparent conflict between the Dictionary of Occupational Titles ("DOT") and the vocational expert's testimony and (2) failed to properly address the opinion evidence when assessing Plaintiff's mental RFC. (Pl.'s Br. [Doc. #16] at 1.) After careful consideration of the entire record, the Court finds that neither of Plaintiff's contentions merit remand.

    A.    DOT Conflict

As set out above, the ALJ found, in pertinent part, that Plaintiff "must learn work by demonstration" and can have only "occasional contact with coworkers and supervisors." (Tr.

6

at 17.) The ALJ then asked a vocational expert ("VE") to identify jobs that could be performed by a hypothetical individual with these limitations. (Tr. at 65-66.) The expert testified that such an individual could perform medium, unskilled jobs such as kitchen helper (DOT 318.687-010, 1991 WL 672755), packer (DOT 920.587-018, 1991 WL 687916), and material handler (DOT 922.687-058, 1991 WL 688132). (Tr. at 66.) Ultimately, the ALJ relied on the VE's testimony at step five of the sequential analysis to find Plaintiff capable of performing the cited jobs. (Tr. at 24-25.) However, Plaintiff now argues that all of the jobs identified at step five, as defined in the DOT, conflict with the mental limitations set out in the RFC.

The Fourth Circuit Court of Appeals has recognized that an ALJ has an affirmative "duty to make an independent identification of apparent conflicts" between VE testimony and the provisions of the DOT, regardless of whether a conflict is identified by the VE. Pearson v. Colvin, 810 F.3d 204, 208-09, 210 (4th Cir. 2015). In Pearson, the plaintiff's RFC limited him to occasional overhead reaching with the upper nondominant extremity, while all three of the jobs identified by the VE required frequent reaching. Id. at 206, 210. Although a claimant with the plaintiff's limitations could still conceivably perform the jobs identified by the VE despite this discrepancy, the Fourth Circuit concluded that, under Social Security Ruling ("SSR") 00-4p, remand was required so the ALJ could elicit a reasonable "explanation from the expert" for the apparent conflict before relying on the VE's testimony. Id. at 208-209, 211.

In the present case, all of the jobs identified at step five are defined as having a specific vocational preparation ("SVP") level of 2, meaning that they require"[a]nything beyond short demonstration up to and including 1 month" of training to learn. DOT, App. C, 1991 WL

7

688702. Plaintiff now argues that the requirement that he "learn work by demonstration" presents an apparent conflict with jobs requiring up to a month of training. However, as Defendant correctly notes, "Plaintiff's argument conflates the method of *how* to learn a job with the *amount of time* to learn a job." (Def.'s Br. [Doc. #18] at 9.) The RFC limitation in the present case simply reflects Plaintiff's need to learn by demonstration rather than written instructions. (Def.'s Br. at 9-10.) Accordingly, "[t]here is no conflict between Plaintiff learning a job by demonstration and Plaintiff taking up to a month to learn it that way." (Def.'s Br. at 9-10) (citing Scott v. Comm'r of Soc. Sec., No. 1:10 CV 0061, 2011 WL 720198, at *9 (N.D. Ohio Jan. 25, 2011), report and recommendation adopted sub nom. Scott v. Astrue, No. 1:10-CV-00061, 2011 WL 711459 (N.D. Ohio Feb. 22, 2011) (finding an RFC limitation to learning the job by oral instructions or by demonstration consistent with SVP 2 jobs: "The level of time required to learn the job-specific skills is consistent with the method by which the instruction is conveyed. It is presumed that Plaintiff can perform a job that requires anything beyond a short demonstration up to and including one month if the instruction is presented orally and demonstratively.")). Here, the specific testimony offered by the VE further supports such a finding. In particular, immediately after testifying that all of the jobs identified at step five had an SVP of 2, the VE affirmed that the same jobs could be learned by demonstration. (Tr. at 66).

Plaintiff nevertheless contends that, "[e]ven assuming arguendo that the Commissioner is correct," the requirement that Plaintiff "spend up to a month with his supervisor or coworker demonstrating the job in order for him to learn it" would conflict with his further RFC limitation to "occasional contact with coworkers and supervisors." (Pl.'s Reply Br. [Doc.

8

#19] at 1 (quoting Tr. at 17).) However, as previously noted, jobs with an SVP level of 2 may take up to a month to learn the job-specific skills, but nothing on the face of this definition suggests an apparent conflict with Plaintiff's restriction to occasional interaction with coworkers and supervisors. In this regard, Plaintiff's argument appears to conflate the frequency of any demonstrations or interactions on a given day with the overall number of days or length of time it might take to learn the various job skills, and as part of this argument Plaintiff makes assumptions and points to only possibilities of a conflict that are not apparent conflicts with the DOT. See Pearson, 810 F.3d at 209 (rejecting the contention that all "possible" conflicts must be identified and resolved). Moreover, nothing in the DOT, including the specific job descriptions, indicates that training would involve working with a supervisor or coworker more than occasionally during the one month period. Contrast Pearson, 810 F.3d at 211 ("Although the [DOT] does not expressly state that the occupations identified by the expert require frequent bilateral overhead reaching, the [DOT's] broad definition of 'reaching' means that they certainly *may* require such reaching."). Here, there is no indication in the DOT or otherwise that Plaintiff would require more than occasional interaction with coworkers or supervisors to either learn or perform the simple job tasks in question.[4] Accordingly, the RFC limitation to occasional contact with supervisors and coworkers does not appear to conflict with an SVP of 2 or the other limitations of the RFC, and the Court finds no basis for remand.

---

[4] Notably, the jobs proffered by the VE are expressly characterized in the DOT as having "not significant" levels of relating to people. 1991 WL 687916 (Packer, DOT 920.587-018), 1991 WL 672755 (Kitchen Helper, DOT 318.687-010), 1991 WL 688132 (Material Handler, DOT 922.687-058. See Gill v. Berryhill, No. 3:17-cv-00430-FDW-DSC, 2018 WL 2107196 at *3 (W.D.N.C. May 7, 2018); Vizzini v. Berryhill, No. 1:17-cv-00233-RJC-DSC, 2018 WL 4561623 at *3 (W.D.N.C. Sept. 24, 2018).

9

B.  Opinion Evidence

Plaintiff next contends that the ALJ failed to consider the opinion evidence in accordance with the regulations. In particular, Plaintiff argues that the ALJ erred in evaluating the medical opinion of the consultative examiner, Dr. Joy Welcker, and the opinions of Plaintiff's former teachers, Dorothy Williams and Anthony Edwards.

From her January 2016 examination of Plaintiff, Dr. Welcker drew the following conclusions:

> Results from the current evaluation are felt to reflect a reliable estimation of [Plaintiff's] present level of functioning. Cognitive potential is estimated to be in the low average range, but was negatively impacted by problems with language (reflected in the verbal comprehension index) and inattention/impulsivity (reflected in the working memory and processing speed indices). Academic performance in reading, math, and written language was also impaired. This claimant is expected to have some difficulty with understanding/retaining/following instructions (may require repetition or monitoring) and tolerating the stress/pressures of day-to-day work activity (easily fatigued, low energy/low motivation, possibly attributable to depression). He may also have difficulty sustaining attention to perform simple, repetitive tasks and he may not remain motivated to complete such tasks without close supervision. No significant problems with peer relations are expected in the workplace, given proper supervision and monitoring. Following high school, he is likely to benefit from a structured employment situation with reduced hours and appropriate supervised support to increase physical activity, promote independence, and facilitate personal accomplishment. This may be achieved via working with Vocational Rehabilitation Services, if he qualifies. He may also benefit from short-term psychotherapy to address problems with mood and motivation and to improve coping skills.

(Tr. at 463.)

The ALJ recounted Dr. Welcker's opinions in her decision, but she ultimately assigned Dr. Welcker's opinion only partial weight. Although the ALJ found that Dr. Welcker's posited limitations were "consistent with the record," the ALJ further determined that "this is at least in part because her opinion is unhelpfully vague. [Dr. Welcker] opined that the claimant would

10

have some difficulty, but not how much this difficulty would affect him. For this reason, her opinion can only be indicative of some level of impairment, and only given some weight." (Tr. at 23.)

In response, Plaintiff asserts that "not all of [Dr. Welcker's] opinions are vague. For instance, she opined that Mr. Hicks may need 'close supervision' in a job setting after he leaves high school and would likely need a 'structured' work setting with 'reduced' (part-time) hours." (Pl.'s Br. at 8 (citing Tr. at 463).) However, in making this argument, Plaintiff incorporates examples of the "vague" language he now challenges. Dr. Welcker prefaced her findings, including those cited by Plaintiff, with modifiers such as "may" and "likely" rather than indicating the maximum abilities which define an RFC assessment. In fact, other than her opinion that "[n]o significant problems with peer relations are expected in the workplace," Dr. Welcker framed all of her findings in indefinite and/or non-vocational terms. (Tr. at 463.) She found, for example, that Plaintiff's impaired cognitive potential and academic performance could cause "some difficulty with understanding/retaining/following instructions" such that he "may require repetition or monitoring," that Plaintiff may have some difficulty "tolerating the stress/pressures of day-to-day work activity" due to low energy and motivation, and that he "may also have difficulty sustaining attention to perform simple, repetitive tasks," again due to low motivation. (Tr. at 463.)

To the extent that these opinions suggest that Plaintiff required limitations relating to concentration, persistence, and pace, understanding, retaining, and following instructions, and maintaining motivation, the ALJ specifically considered the results of Dr. Welcker's evaluation (Tr. at 20, 22) and determined that Plaintiff "can perform simple, routine and repetitive tasks,"

11

"can perform work that involves routine changes, but is not production oriented," and "must learn work by demonstration." (Tr. at 17.) These limitations are consistent with the limitations opined by the State Agency psychologist Dr. Margaret Barham, who also considered and analyzed Dr. Welcker's consultative examination. (Tr. at 23, 75-80.) Notably, Plaintiff does not directly challenge these RFC findings. Instead, Plaintiff argues that the ALJ failed to adequately account for Dr. Welcker's opinions that Plaintiff could only perform part-time work or needed close supervision "such that he had to be told how to do his job every day." (Pl.'s Br. at 8.) As explained above, however, Dr. Welcker posited neither of these limitations. She indicated that Plaintiff would "likely benefit" from close supervision, job training, and reduced hours, but not that such restrictions were required or represented the highest level of work Plaintiff was capable of performing. The ALJ considered, evaluated, and weighed Dr. Welcker's evaluation and opinion, and sufficiently explained her reasoning. In the circumstances, the ALJ's analysis and treatment of Dr. Welcker's evaluation does not require remand.

With respect to the ALJ's treatment of opinion evidence from Plaintiff's former teachers, the ALJ specifically noted in the administrative decision that she considered questionnaires completed by Plaintiff's teachers as well as a prior decision by a State Hearing officer. The ALJ further noted that "their opinions are not weighed since they are not health care professionals," (Tr. at 23), but the ALJ still considered and described the opinions from Ms. Williams' teacher questionnaire at length. Under the regulations applicable in this case, with respect to opinions from non-medical sources, "[t]he adjudicator generally should explain the weight given to opinions from these sources <u>or otherwise ensure that the discussion of the</u>

evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." 20 C.F.R. § 416.927(f)(2) (emphasis added). With respect to this requirement, Social Security Ruling 06-03p previously explained that:

> Although 20 CFR 404.1527 and 416.927 do not address explicitly how to evaluate evidence (including opinions) from "other sources," they do require consideration of such evidence when evaluating an "acceptable medical source's" opinion. For example, SSA's regulations include a provision that requires adjudicators to consider any other factors brought to our attention, or of which we are aware, which tend to support or contradict a medical opinion. Information, including opinions, from "other sources"–both medical sources and "non-medical sources"–can be important in this regard. In addition, and as already noted, the Act requires us to consider all of the available evidence in the individual's case record in every case.
> . . . .
> Although the factors in 20 CFR 404.1527(d) and 416.927(d) explicitly apply only to the evaluation of medical opinions from "acceptable medical sources," these same factors can be applied to opinion evidence from "other sources." . . . .
> . . . .
> Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

Titles II & XVI: Considering Opinions & Other Evidence from Sources Who Are Not "Acceptable Med. Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental & Nongovernmental Agencies, SSR 06-03p, 2006 WL 2329939, at *4, *6 (Aug. 9, 2006).[5] Here, the ALJ included an extensive discussion and analysis of Ms. Williams'

---

[5] The Court notes that on March 27, 2017, SSR 06-3p was rescinded in connection with the new regulations applicable to claims filed on or after March 27, 2017. See Rescission of Social Security Rulings, 82 Fed. Reg. 15263-01, 2017 WL 1105348 (Mar. 27, 2017); Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 at 5854-55, 2017 WL 168819 ("Under SSR 06-03p, we consider opinions from medical sources who are not AMSs and from nonmedical sources using the same factors we use to evaluate medical

13

opinion that is sufficient to allow the Court to follow the ALJ's reasoning. In particular, the ALJ recounted as follows:

> A teacher report was completed for the claimant in December 2015. The teacher stated that the claimant chose to be out from school, and had missed twenty-five of seventy-five days of school without providing doctor notes as of the time of the report. His reading ability was at the eighth grade level, his math ability was at the fourth grade level, and his writing ability was at the 6th grade level. He had slight to obvious problems acquiring and using information, but the teacher noted that his absences contributed to his lack of progress at school. He often pretended not to understand information to avoid working up to his true potential. He mostly had slight to no problems attending and completing tasks. He had slight to no problems interacting and relating with others. Almost all of his speech was understood whether topic of conversation was known or not. He had mostly slight to no problems moving about and manipulating objects. He mostly had slight to no problems caring for himself. The teacher stated that the claimant's day reflected 100% exceptional children services due to his need to complete vocational hours requirements, but that he functioned perfectly without major adaptations in a general education curriculum. He had finished all general education requirements needed for graduation. His student transcript from December 2015 showed enrollment in multiple occupational courses. There was also enrollment in the standard version of some courses. During the eleventh grade, he was able to earn a C in the standard version of Microsoft Excel & Access. He was also able to earn a B in the standard versions of Sports & Entertainment Marketing and Reserve Officers' Training Corps. His expected graduation date at the time was 6/8/16, and no later records indicate that he diverged from expectations.

(Tr. at 19-20.)

Plaintiff now argues that

> [t]he ALJ's error in failing to assign weight to Ms. Williams' opinion was particularly harmful given that she did not discuss the more favorable aspects of Ms. Williams' assessment when discussing the questionnaire in her decision.

---

opinions from AMSs. We state that an adjudicator generally should explain the weight given to opinions from these sources, or otherwise ensure that the discussion of the evidence in the determination or decision allows an individual or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case. In addition, when an adjudicator determines that an opinion from one of these sources is entitled to greater weight than a medical opinion from a treating source, the adjudicator must explain the reasons in the determination or decision if the determination is less than fully favorable under our current rules. In these final rules, we have included these policies from SSR 06-03p into final 404.1527 and 416.927 for claims filed before March 27, 2017.").

> While the ALJ mentioned Ms. Williams' statements that she felt Mr. Hicks was lazy and overly dependent on his mother (see AR 19-20), the ALJ failed to discuss how Ms. Williams felt he had a "serious problem" working at a reasonable pace and finishing on time as he "works very slowly and needs constant encouragement." AR 307. She also failed to note that he spent 100% of his time in special education classes. See AR 19-23; 312. The VE testified that if Mr. Hicks could not complete work tasks in a timely manner, he would be unable to perform competitive work. See AR 66. Additionally, the VE testified that if he required reminders every day of how to do his work, then he would be disabled. See AR 67. Thus, the ALJ's failure to discuss the entirety of Ms. Williams' assessment and assign weight to her opinion was harmful error.

(Pl.'s Br. at 9-10.)

However, contrary to Plaintiff's assertion, the ALJ specifically noted that Plaintiff received "100% exceptional children services." (Tr. at 19-20.) As set out above, the ALJ's discussion reflects Ms. Williams' report that Plaintiff's day reflected "100% exceptional children services due to his need to complete vocational hours requirements, but that he functioned perfectly without major adaptations in a general education curriculum." (Tr. at 20, 312.) Moreover, Plaintiff acknowledged, as Ms. Williams opined in her questionnaire, that many of his problems with work completion stemmed from his choices rather than his abilities. For example, "[o]n November 18, 2015, [Plaintiff] reported making A's in school and the reason he made F's the year before was because he refused to do his homework. (7F/3-9; 10F/1-10)." (Tr. at 19.) This is consistent with Ms. Williams' opinion that Plaintiff "has learned how to get out of doing his assignments both at home and at school." (Tr. at 312.) Although Plaintiff contends that the "serious, daily problems working at a reasonable pace and finishing on time" opined by Ms. Williams would preclude all work, the same form states that Plaintiff has no problem focusing long enough to finish an assigned task and only a slight problem completing tasks and assignments. (Tr. at 307.) Ms. Williams also noted

15

throughout the teacher questionnaire that Plaintiff's laziness, learned helplessness, and manipulation of his parents, who are cognitively lower-functioning than he is, resulted in a very high number of absences and very low motivation, strongly contributing to the problems with persistence and pace noted in her opinion. (Tr. at 19-20, 306-07, 311-12.) The ALJ recounted in her decision that these problems compounded Plaintiff's extant difficulties acquiring and using information, but that Plaintiff's performance improved significantly when he chose to apply himself. (Tr. at 19-20.)

More importantly, the ALJ incorporated limitations in the RFC assessment to account for Plaintiff's difficulties with persistence and pace, including a limitation to no "production oriented" work. (Tr. at 17.) She further limited Plaintiff to work involving only "simple, routine and repetitive tasks" and "routine changes," and, as noted above, work that can be learned by demonstration. (Tr. at 17.) Again, Plaintiff makes no direct challenge to these limitations or suggests that they are unsupported by the record as a whole. Overall, in discussing the evidence contained in Ms. Williams' questionnaire, as well as Plaintiff's school records and transcripts as a whole, the ALJ reasoned that, despite his difficulties, Plaintiff was capable of performing well in school when he chose to do so, including in the standard versions of some classes, and that he graduated on time. (Tr. at 20, 22.) The ALJ's evaluation of Mr. Williams' questionnaire includes a sufficient discussion and analysis of the evidence to allow the Court to follow the ALJ's reasoning. Accordingly, Plaintiff fails to demonstrate reversible error.

Finally, Plaintiff contends that the ALJ omitted any reference to Mr. Edwards' opinion in her decision. However, Mr. Edwards completed the teacher questionnaire at issue in 2007,

16

more than a decade before the hearing in this case. Notably, with regard to the opinion of a consultative examiner rendered in the same year, 2007, the ALJ expressly assigned the findings "little weight, since the remoteness of the opinion is not relevant to the claimant's current functioning." (Tr. at 23.) The same rationale clearly applies to Mr. Edwards' opinion. Although Plaintiff argues that the questionnaire is relevant due to the lifelong nature of Plaintiff's impairments, the issue here is not the impairments themselves, but rather their impact on Plaintiff's functioning during the time period at issue, from February 12, 2016 to the date of the ALJ's decision. (Tr. at 15.) Mr. Edwards assessed Plaintiff's functional abilities on August 23, 2007, just after Plaintiff's tenth birthday, during the application process for child supplemental security income. (Tr. at 242-99.) Notably, Plaintiff was awarded benefits at that time. The present case, in contrast, concerns Plaintiff's disability redetermination upon reaching adulthood and involves updated evidence as well as different factors for assessment than those considered in a childhood disability case. (Tr. at 15.) The ALJ sufficiently explained the irrelevance of remote opinions from 2007, and the ALJ's reasoning is clear. As such, the ALJ's failure to further address or weigh Mr. Edwards' opinion provides no basis for remand.[6]

---

[6] Although not raised as a separate assignment of error, Plaintiff's brief also includes a discussion of Plaintiff's IQ scores as a child. However, the ALJ considered and discussed at length Plaintiff's recent testing and IQ scores. (Tr. at 17, 20, 22.) For example, the ALJ explained that:

> In 2007, when he was 10 years old, testing revealed a Full Scale IQ score of 61 (Exhibit 4F). However, in January of 2016, when [Plaintiff] was 18, he was administered the Wechsler Adult Intelligence Scale-IV, and achieved a verbal comprehension score of 72, a perceptual reasoning score of 82, a working memory score of 66, a processing speed score of 74, and a Full Scale IQ of 70. . . . The achievement test scores were equivalent to the third to fourth grade levels of ability (Exhibit 9F). [Plaintiff's] current intellectual functioning is higher than testing in 2007 . . . .
> . . . .
> [Plaintiff] does have below average scores on intelligence testing from January 2016. However, most of the scores, including his overall full scale IQ are within the borderline range of functioning and his perceptual reasoning score of 82 is actually within the low average range of functioning. These

17

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be AFFIRMED, that Plaintiff's Motion for Judgment Reversing the Commissioner [Doc. #15] be DENIED, that Defendant's Motion for Judgment on the Pleadings [Doc. #17] be GRANTED, and that this action be DISMISSED with prejudice.

This, the 30th day of August, 2021.

/s/ Joi Elizabeth Peake
United States Magistrate Judge

---

scores, especially his perceptual reasoning score, would suggest [Plaintiff] is capable of much more than he had his mother testified to.

(Tr. at 17, 22.) Similarly, Plaintiff cites to certain of the information from his psychiatrist, Dr. Moore, but the ALJ also addressed that evidence at length, including Dr. Moore's later records reflecting that Plaintiff should be working or in school and that she would not restart his stimulant medication unless he got a job. (Tr. at 21, 23, 615, 623, 627, 632.) Plaintiff essentially asks the Court to reconsider and re-weigh this evidence. However, it is not the function of this Court to re-weigh the evidence or reconsider the ALJ's determinations if they are supported by substantial evidence. As noted above, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]" Hancock, 667 F.3d at 472 (quotation omitted). Thus, the issue before the Court is not whether a different fact-finder could have drawn a different conclusion, or even "whether [Plaintiff] is disabled," but rather, "whether the ALJ's finding that [Plaintiff] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig, 76 F.3d at 589. Here, the ALJ reviewed the evidence, explained her decision, explained the reasons for her determination, and that determination is supported by substantial evidence in the record.

18